### 3335.   CENTRAL OF GEORGIA RAILWAY CO. *v.* BIRD.

Where a railroad company, in pursuance of an agreement with a warehouse company, places one of its cars on a side-track in front of the warehouse, for the purpose of having the car loaded with cotton stored in the warehouse, for immediate shipment, the railroad company to pay for the work of loading, and the cotton is loaded on to the car by employees of the warehouse company, properly marked as to destination, and with name of consignor and consignee, this is a delivery to the railroad company as a common carrier of the cotton, and the railroad company would be responsible to the owner of the cotton for its destruction by fire while in its possession.

DECIDED JANUARY 30, 1912.

Action for damages; from city court of Statesboro—Judge Boykin presiding.   February 18, 1911.

*Lawton & Cunningham, Alexander R. Lawton 3d,* for plaintiff in error.

*A. M. Deal,* contra.

HILL, C. J.   Bird recovered a verdict from the Central of Georgia Railway Company, for $3,052.58 as damages, the value of 41 bales of cotton consumed by fire while in a car of the defendant, and the case is here on exceptions to the judgment overruling the defendant's motion for a new trial.   The facts, briefly stated, are as follows: Bird, the owner of the 41 bales of cotton, placed them in the Farmers' Union Warehouse at Metter, Georgia, marked for shipment to Savannah, Georgia.   This warehouse was within three or four yards of the track of the defendant, and between three and four hundred yards from its depot.   The defendant, in pursuance of custom and under an agreement it had with the warehouse company, placed a car for the reception of this cotton near the warehouse, the owner of the cotton intending that it should be transported to Savannah the day after the loading of the car with the cotton.   The agents of the warehouse company loaded the car with

the cotton, and, in the afternoon, having completed the loading, closed the door of the car, but did not seal it. The evidence was in conflict as to whose duty it was to seal the door of the car, whether that of the agents of the warehouse company, or that of the agents of the railway company. The loading of the car was completed in the afternoon, about 5 o'clock. On the same night, between 10 and 11 o'clock, the car, with the cotton, was entirely consumed by fire. A mixed freight and passenger train passed between 12 and 1 o'clock in the daytime, while the car was being loaded. The next and only train that passed before the fire was a passenger train, which passed at 5.45 o'clock p. m. The agents of the warehouse company who did the loading testified that neither one of them smoked, that there were no matches about the car, nor anything else by which the cotton could have been ignited, so far as they could discover, when they closed the car and left it. It was proved by the railroad company that at the point where the car was located, although the track was up-grade, on account of its proximity to the depot where both the freight and passenger trains were stopped, no sparks were emitted by either one of the engines of these trains, the engineers of both trains testifying that their engines were simply rolling as they passed the warehouse, and that engines never emit sparks when rolling, but only when they are working. The first freight train upon which the cotton could have been moved after it had been loaded in the car was one on the next day, which was expected to take up the car for the purpose of transporting it to Savannah, its destination, and this train was expected to pass Metter on the next morning between 10 and 11 o'clock.

A contract between the Farmers' Union Warehouse and the Central of Georgia Railway Company was introduced in evidence, by the terms of which the railway company agreed to issue " its regular cotton bills of lading on cars by the said Farmers' Union Warehouse at cotton warehouse situated upon the side-track of the said railway company at Metter, Ga., upon the written statement of the said Farmers' Union Warehouse, their agents or employees, as to the consignor, consignee, destination, number of bales, and marks of all cotton so loaded at cotton warehouse," upon certain conditions as to the method of loading and as to the care and diligence of the warehouse company to see that the cars were in a proper and "clean condition, that is, free from anything likely to damage the cotton,

such as loose matches, waste, oils, filth, etc., and [should] have the end windows of the cars closed, stripped, and sealed in a proper manner," and that when the cars had been loaded, the Farmers' Union Warehouse should cause the doors thereof to "be also closed, sealed, and stripped in a proper manner." There was also introduced in evidence an agreement between the railway company and the Farmers' Union Warehouse that the former should pay the latter stipulated amounts for its services in loading the cars. There was no evidence that any bill of lading was issued for the cotton to the warehouse company, or to the shipper. There was no evidence that the railroad company had been notified after the loading of the car that it was ready for shipment, but the evidence is undisputed that the bales of cotton were marked for destination, and that the cotton was to be shipped by the first freight train passing on the next day; that the custom of the company was to deliver the cars to an adjacent entrance into the warehouse, for the purpose of having the warehouse agents load the cotton thereon; that this cotton was loaded on the car which the railway company placed there on the day the cotton was burned; and the value of the cotton was proved.

Under this evidence the attorney for the railroad company contends, (1) that there was no delivery of the cotton to the railway company in its capacity of a common carrier, nor any delivery to it as a warehouseman; and (2) that there was no evidence whatever that any spark from a passing engine consumed the cotton, or that it was destroyed by any negligence of the railway company or its agents.

1. Did the facts show delivery to the railway company, and, if so, was that delivery to the company as a common carrier, or as a warehouseman? Of course, if it was delivered to the railway company in its capacity of a common carrier, the plaintiff was entitled to recover upon proof of ownership, delivery, and loss. The question is not free from doubt, but our opinion is that, under the law, the facts show a delivery to the railway company as a common carrier. The Civil Code (1910), § 2730, declares that "the responsibility of the carrier commences with the delivery of the goods, either to himself or his agent, or at a place where he is accustomed or agrees to receive them." Whom did the warehouse company represent in loading the cotton on the car? Did it represent the rail-

way company, or the owner of the cotton, or both? It was unquestionably the agent of the owner in receiving the cotton into its warehouse, but it seems to us plain that it was the agent of the company in loading the cotton from the warehouse on the company's car. The company, by a written contract, created this relationship between it and the warehouse company, so far as the loading of the cotton was concerned. It stipulated that the loading was to be done by the warehouse company, and how it was to be done, and it had agreed to pay the warehouse company compensation for the work of loading the car. In addition to this, it seems to us, from the fact that the car was placed by the railway company near the warehouse, where it was accustomed to place it, and where it had agreed to place it for the warehouse, for the purpose of having it loaded by the warehouse agents with cotton for shipment, that when the cotton was loaded on the car at that place, it was a delivery to the railway company. When the cotton got out of the warehouse and into the car of the railway company, it got into the control and custody of the railway company, and out of the control and custody of the warehouse company. We think the delivery in this case, under the facts, was an actual delivery, and that it was accepted by the railway company. Certainly there was such constructive and implied delivery and acceptance as would make the railway company liable as a carrier.

It is insisted that there was no complete delivery, because there was something else for the shipper to do, and that no bill of lading had been issued by the company, and that there could not be, in law, a complete delivery until a bill of lading had been issued. The responsibility of the company as a carrier began with the completion of the delivery by the warehouse company, whether a bill of lading had or had not been issued at that time. 4 Elliott on Railroads, § 1403, and citations. In this case the bill of lading, according to the evidence, was to have been delivered to the warehouse company for the shipper. The evidence does not disclose who was to pay the freight on the cotton, or whether or not the freight had been paid. Indeed, it fails to disclose anything that the shipper was required to do, except to put the cotton into the hands of the warehouse company, marked for transportation, depending upon the warehouse company and the railway company to load the car and complete the transportation. Where cattle have

been placed in the company's pen for immediate shipment, and part of them have actually been loaded on the cars, the cattle are in the custody of the company as a carrier, and not as a warehouseman. 4 Elliott on Railroads, § 1404, and citations.

In the view we take of the case, it makes little difference whose agent the warehouse company was, whether that of the shipper or of the railway company, for we think the placing of the car by the company at the warehouse, and the loading of the cotton on the car marked for its destination and for immediate shipment, constituted a delivery and acceptance by the railway company as a common carrier. The evidence is undisputed that the cotton was to be shipped the next day, on the first freight train, the very first opportunity for shipment. This, in our opinion, makes an immediate shipment in the meaning of that term, for it was to be shipped on the very first train of the company that passed Metter after the car had been loaded, on the morning of the next day. It has also been held that goods stored along the line of a railway company awaiting shipment, where the owner is to load them when he gets a car, are not delivered to the company *until* they are so loaded and ready for shipment. In the case of *Fleming* v. *Hammond*, 19 *Ga.* 145, it was held that, "if the owner of a boat directs cotton to be left at a particular landing on the river, agreeing to receive it there, a deposit of the cotton at that place constitutes a good delivery." It was held in Packard v. Getman, 6 Cow. (N. Y.) 757 (16 Am. Dec. 475), that "where a railroad company furnishes a car for the purpose of being loaded, and assents to the placing of goods therein, the goods are as much in the possession of the company as if they had been delivered in its warehouse for shipment, and the company is liable where they are thereafter destroyed by fire, though it occurs before a bill of lading has been signed." See, also, to the same effect, East Line R. Co. v. Hall, 64 Tex. 620. In 5 Amer. & Eng. Enc. of Law, 190, it is said that "it is sufficient for the plaintiff to show that the goods were delivered to a person and at a house where goods were accustomed to be left for the carrier." "Delivery to a drayman, or other servant of the company who is accustomed to collect and receive goods for the company at the places of business of its patrons, is a delivery to the company." 4 Elliott on Railroads, § 1406.

It is insisted by learned counsel for the railway company that

the company had no notice, either actual or constructive, of the delivery of the goods. If the deposit is made in the usual manner, at the place where goods have been constantly received for transportation, a railroad company may, it seems, be charged with constructive notice, even though the delivery was not made to any of its servants. The evidence in this case shows that the cotton was delivered at the place where the railroad company was accustomed to receive it. It was delivered on one of its own cars. On the very day on which the cotton was consumed the car had been taken by the railroad company and placed in front of the warehouse for the purpose of having it loaded with the cotton, and the loading was to be done by agents of the warehouse company, which the railway company had in writing constituted its agent for that purpose. These facts bring it squarely within the principle of the ruling that where a railroad company had erected a platform on which, in the usual course of business, cotton was stored for shipment by the next train, and the cotton was destroyed by fire set by one of the company's locomotives, the shipper could recover as from a carrier. And where it was the custom to deposit cotton in the street beside the railroad company's platform, or in the company's cotton yard, a delivery there was held sufficient. 4 Elliott on Railroads, § 1411. It is needless to cite other authority, for, under the authorities already cited, applied to the facts of this case, it must be conceded that the cotton, when it was consumed by fire, was in the possession of the railroad company, having been delivered and received by it as a common carrier for immediate transportation. This conclusion having been reached, it is of course unnecessary to consider the other question, for the railway company as a common carrier is liable for the full value of the cotton consumed by fire while in its possession, unless the fire was caused by the act of God or the public enemy.          *Judgment affirmed. Pottle, J., not presiding.*